# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

PAMELA ROLAND
*as administrator of the estate of*
KEIONTAY DAVIS, et al.

      Plaintiffs,

v.

WINGATE MANAGEMENT
COMPANY, LLC,

      Defendant.

Civil Action Nos.
1:22-cv-001692-VMC
1:22-cv-001693-VMC
1:22-cv-001694-VMC
1:22-cv-001695-VMC
1:22-cv-001696-VMC

## OPINION AND ORDER

These five civil actions[1] are before the Court on Defendant Wingate Management Company, LLC's ("Wingate") Motion for Summary Judgment filed in each of the cases (the "Motions").

---

[1] The cases are *Roland v. Wingate Management Company*, LLC, No. 1:22-cv-01692-VMC; *Long v. Wingate Management Company, LLC*, No. 1:22-cv-01693-VMC; *Newton v. Wingate Management Company*, LLC; No. 1:22-cv-01694-VMC; *Phillips v. Wingate Management Company, LLC*, No. 1:22-cv-01695-VMC; and *Sims v. Wingate Management Company, LLC*, No. 1:22-cv-01696-VMC. The cases have not been consolidated. References to docket entries in the various cases in this Order will take the form of "(Plaintiff's Last Name Doc. __)," except as to Plaintiff Roland, as explained in Note 3, below. Citations to the parties' respective briefs are to the internal pagination, rather than the ECF header stamps, unless indicated otherwise.

## Background[2]

### I.    The Bedford Pines Community

Bedford Pines is a scattered-site apartment community that is not contiguous. (Davis Doc. 112 ¶ 5).[3] At all relevant times, Wingate solely and exclusively managed Bedford Pines. (*Id.* ¶ 1). The Bedford Pines buildings are spread out over several city blocks and interspersed with non-Bedford Pines properties, including commercial buildings, vacant buildings, single-family homes, townhome communities, and public parks. (*Id.* ¶ 5).

Bedford Pines included an apartment building located at 639 Parkway Drive, Atlanta, GA 30308 ("639 Parkway") with a grassy common area and an uncovered parking lot at 645 Parkway Drive NE, Atlanta, GA 30308 ("645 Parkway"). (*Id.* ¶ 2).

By January 2019, Wingate's management team identified 639 Parkway as a "primary problem area" at Bedford Pines because of regular violent crime. (*Id.* ¶

---

[2] The following facts are drawn from the parties' respective Statements of Material Facts. Citation to the relevant responsive statement without explanation or clarification indicates the Court has deemed the underlying statement admitted. For clarity and ease of reading, the Court omits quotation marks from admitted statements that are reproduced in this Order.

[3] Pamela Roland, as administrator of the estate of Keiontay Davis, was substituted for Keiontay Davis in Case No. 1:22-cv-01692-VMC on September 2, 2025, but the Court continues to refer to that case as "Davis" in this Order as that is how the parties briefed the Motions. (Davis Doc. 124).

20).[4] In the 36 months prior to June 30, 2020, there were 679 violent crimes against persons in the half-mile radius surrounding 639 Parkway Drive. (*Id.* ¶ 21). The 679 violent crimes include willful killing, person shot, person stabbed, aggravated assault/battery, fight, armed robbery, robbery, carjacking, kidnapping, and rape. (*Id.* ¶ 22). 639 Parkway is in the area with the highest concentration of those 679 violent crimes. (*Id.* ¶ 23). Wingate's own security expert, Jon Groussman, concluded: "[T]here were a lot of shootings" at Bedford Pines, with a "cluster" near 639 Parkway. (*Id.* ¶ 24). The 600 Parkway block had a history of drive-by shootings that extended over the course of multiple years. (Rule 30(b)(6) Deposition of Wingate Mgmt. Co., LLC by Cynthia Bianco dated Jan. 24, 2024 95:2–16, "Bianco Dep.," Davis Doc. 107-1). It was incredibly common for shots to be

---

[4] Wingate objects to several of Plaintiffs' statements on the grounds of materiality because "[t]here is no evidence that a drive-by shooting can be anticipated without some prior information about when and where it will occur." (*E.g.* Doc. 112 ¶ 20). These objections are overruled for several reasons. First, the objections are nonresponsive because (aside from Plaintiffs' Statements Nos. 51–54, which are not deemed admitted) the challenged statements are not directly seeking admissions that the Wingate could have anticipated the shooting in question—that is obviously a material dispute of fact. Second, the statements are material because they go toward foreseeability and duty of care, "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The Court recognizes that Wingate argues that drive-by shootings are not foreseeable as a matter of law, but that is a position better addressed in the argument section of their brief rather than the factual background.

fired out of moving cars towards Bedford Pines buildings near 639 Parkway; it happened half a dozen times a week. (Davis Doc. 112 ¶ 26).

Wingate's corporate representative testified that enhanced security patrols on the 600 Parkway Drive block of Bedford Pines "yielded results" by reducing crime. (*Id.* ¶ 85).[5] By 2020, Wingate contracted with Plaza Security, LLC ("Plaza") to oversee security measures and to assist in the hiring of off-duty Atlanta Police Department ("APD") officers. (*Id.* ¶ 10). The off-duty APD officers who patrolled Bedford Pines were employed by Wingate. (*Id.* ¶ 11). Plaza specifically recommended nighttime security patrols at Bedford Pines, but Wingate had persistent challenges filling security shifts at night with the off-duty APD officers. (*Id.* ¶¶ 32, 35).[6] This is because Wingate did not "control" when off-duty APD officers patrolled Bedford Pines. (*Id.* ¶ 38). This left a security "void" at Bedford Pines at night. (*Id.* ¶ 37). The essence of the parties' dispute is whether Wingate

---

[5] Wingate argues that this fact is immaterial, writing that "[w]hether patrols 'yielded results' generally at some indeterminant point in time does not indicate that patrols would have prevented a drive-by shooting," but the Georgia Court of Appeals has considered this sort of fact as relevant in the causation context. *Pappas Rest., Inc. v. Welch*, 901 S.E.2d 751, 758 (2024) ("There was testimony from Pappas and Tactical employees that security had reduced crime on the property, leading to the conclusion that Welch has offered more evidence than speculative expert testimony."). It is unclear what Wingate's further objection about the statement not being "self-contained" signifies.

[6] Wingate's materiality objection is overruled. Whether additional patrols were in fact available does not render this statement immaterial, it simply presents a fact question.

could have done more to fill the "void." Plaintiffs retained two experts, Charles Ahmad and Jane Gray, and one rebuttal expert, Elizabeth Dumbaugh. (*Id.* ¶ 80). Collectively, these experts opined that the shooting was more likely than not preventable with security personnel: (1) patrolling Wingate's primary problem area (because security patrols deter crime), (2) enforcing house rules (to disperse the outdoor restaurant and crowd from the 639 Parkway common area so that they were not exposed targets in an area Wingate knew had a pattern of violent crime), and/or (3) warning those gathered of the pattern of violent crime and the lack of needed nighttime security. (*Id.*).[7] Wingate employed its own experts and it disputes that any of these security measures would have prevented the drive-by shooting. (*Id.*).

## II.    The Shooting

From May through June 2020, Stephanie Lewis parked at 645 Parkway from around 7 p.m. until 3 a.m. to grill, sell food and drinks, and play music. (Davis Doc. 112 ¶ 59). The parties dispute whether Ms. Lewis had the right to be there;

_____

[7] The Court only deems admitted this statement to the extent it summarizes the opinions of Plaintiffs' experts; the Court does not deem admitted the underlying conclusions. The deadline to file motions to exclude expert testimony has not yet run. LR 26.2(C). Moreover, the Court does not reach Wingate's argument that a rebuttal expert cannot offer new opinions—these cases involved a number of extensions to the expert disclosure deadlines and without more detail the Court cannot determine whether exclusion of additional opinions would be required under the circumstances. Wingate can renew the issue in connection with submission of the pretrial order.

Wingate argues she did not have permission to operate and that it was not aware of her presence, but Plaintiffs assert that Wingate knew crowds regularly formed where she operated. (*Id.* ¶¶ 59, 65). Plaintiffs argue that Ms. Lewis periodically spoke to Wingate staff and APD officers passing by but was never told she was not permitted to be there, and Plaintiffs further argue that to the extent she was violating the rules, Wingate did not enforce them. (Davis Doc. 105 ¶ 16; Davis Doc. 112 ¶¶ 60, 64).

On June 29, 2020, Ms. Lewis arrived in the parking lot at 645 Parkway in the evening and stayed until approximately 12:50 or 1:00 a.m. on June 30, 2020. (Davis Doc. 112 ¶ 66).[8] After arriving, she parked her van, set up her grill, put out a table, and sold food and drinks. (*Id.* ¶ 67). Ms. Lewis played music from her van to create a festive environment. (*Id.* ¶ 68). Her customers ate and socialized in the lot at 645 Parkway, and in the common area at 639 Parkway next door. (*Id.* ¶ 69). Wingate contends that surveillance video shows Ms. Lewis was no longer present on the property at the time of the shooting and had not been for at least five minutes prior to the shooting. (*Id.* ¶ 58).

---

[8] Wingate's materiality objections to this and the next several statements of fact, which seek to litigate whether Ms. Lewis had the right to operate or provide an implied invitation to others, are overruled. Whether Ms. Lewis or her customers were invitees is a question of fact, and her continued presence is probative of that question. Like many of Wingate's objections, this is a legal argument disguised as a fact objection.

On June 30, 2020 at approximately 1:08 a.m., shooters in two cars opened fire in the direction of Plaintiffs. (Davis Doc. 105 ¶¶ 1, 3). While it is unknown who the assailants were and what their target was, it appears that they were firing on a grassy area inside the fence of the Bedford Pines buildings at 633 and 639 Parkway Drive NE, Atlanta, Georgia 30308 (the "Premises"). (*Id.* ¶¶ 3, 7). The shooters have never been identified. (Davis Doc. 105 ¶ 7). None of the victims have been charged with a crime for the events of June 30th. (Davis Doc. 112 ¶ 74).

## III. The Plaintiffs

### A. Keiontay Davis

On June 30, 2020, Keiontay Davis went to Bedford Pines to visit his sister, Santeba Seaborn, who lived at 443 Ponce. (Davis Doc. 112 ¶ 57). After arriving, Mr. Davis chatted with people who had gathered at 639 Parkway to socialize and eat food from the outdoor food delivery service operated by Ms. Lewis at 645 Parkway. (*Id.* ¶ 58).[9] Mr. Davis was shot while talking with a group in the Bedford Pines common area at 639 Parkway. (*Id.* ¶ 71). Plaintiff went to the hospital for his injuries. (*Id.* ¶ 73).[10]

---

[9] Wingate improperly attempts to dispute this fact by injecting unrelated facts and argument about whether Mr. Davis or Ms. Lewis had the right to be present at the property. These arguments, which have nothing to do with the factual background, are better left to the argument section of the brief.

[10] Wingate's materiality objection is overruled as this is material for damages.

Mr. Davis lived at a Bedford Pines apartment with his mother from 2014 to 2018. (Davis Doc. 105 ¶ 34). When Mr. Davis lived at Bedford Pines, he was aware of violence around the buildings, including "[s]hootings, killings." (*Id.* ¶ 35).[11] Mr. Davis knew of a drive-by shooting that occurred in the area around Bedford Pines prior to June 30, 2020. (*Id.* ¶ 36). Mr. Davis' sister, Kiarra Roland, lived at Bedford Pines from approximately 2011 to 2014. (*Id.* ¶ 37). Ms. Roland "absolutely" did not feel safe at Bedford Pines because there were always police in the area. (*Id.* ¶ 38). Mr. Davis' brother, Naporro Roland, lived at Bedford Pines from approximately 2012 to 2015. (*Id.* ¶ 39). Mr. Roland testified that entire blocks and various locations in the area around Bedford Pines were "deathtraps." (*Id.* ¶ 40). Mr. Roland testified that a person should be armed when outside in the area around Bedford Pines at night "if you wanted to live or make it out . . . ." (*Id.* ¶ 41).

## B.    Kenneth Long

On June 29, 2020, Kenneth Long went to 633 Parkway to meet his friend Tamanika Woods. (Long Doc. 111 ¶ 57).[12] Ms. Woods, a resident of 633 Parkway,

---

[11] Mr. Davis attempts to object to this and the next several statements as contrary to the deposition testimony, but the Court has reviewed the relevant testimony and finds that the testimony Wingate proffered accurately reflect the statements of material fact.

[12] Wingate's materiality objection to this and the following statement are overruled—whether Ms. Woods or Mr. Long had any right to be on the premises is relevant but not conclusive of the material fact disputes. Again, Wingate's objections are better made in the argument section of its brief.

had invited Plaintiff to visit her and had requested his assistance with tasks at her apartment. (*Id.*). Mr. Long visited Ms. Woods and then waited in front of her apartment for his friend, Marcus Sims. (*Id.* ¶ 58). Ms. Woods had also invited Mr. Sims to her apartment. (*Id.* ¶ 59). While waiting for Mr. Sims, Mr. Long joined people in the 639 Parkway common area, which was next to the building where Ms. Woods lived. (*Id.* ¶ 60). Some of those gathered there had purchased food from Ms. Lewis. Mr. Long was shot while talking with a group in the Bedford Pines common area at 639 Parkway. (*Id.* ¶ 74). He went to the hospital for his injuries. (*Id.* ¶ 76).

Mr. Long testified he had been around Bedford Pines "all [his] life." (Dep. of K. Long at 28:13-17, Long Doc. 99-4; Long Doc. 104 ¶ 36). Mr. Long testified that police and security were around Bedford Pines "all the time" because "[t]hey be where all the crime is." (Long Doc. 104 ¶ 40).

Mr. Long was arrested in the area around Bedford Pines twenty times from July 2007 to January 2020, including once for criminal trespass at Bedford Pines on April 30, 2013. (*Id.* ¶¶ 37,[13] 39). Ten of those arrests were either for possessing or

---

[13] Mr. Long makes five objections to this statement of fact, some of which he adopts in response to later statements. First, he argues that the evidence cited does not support the statement, presumably based on the argument that the arrests were not "in the area" of Bedford Pines. Several of the arrests occurred in Zone 6, Beat 3, which includes Bedford Pines, and others occurred in the adjacent Zone 5, Beat 5 and nearby Zone 5, Beats 10 and 11. *Advanced Find My Zone*, Atlanta Police Dep't, http://atlantapd.maps.arcgis.com/apps/webappviewer/index.html?id=e891b9

selling drugs. (*Id.* ¶ 41).[14] Mr. Long pled guilty to a cocaine possession charge

arising out of a hand-to-hand transaction witnessed by APD officers on the block

---

b618a747a795d2f609a349ee7b     [http://perma.cc/LQ8T-T3S6]     (last     visited
September 15, 2025). Second, Mr. Long contends the records are not relevant
because they do not go to whether the shooting in this case was foreseeable to
Wingate, but Mr. Long's "knowledge is relevant to the ultimate question of
liability." *Ga. CVS Pharmacy, LLC v. Carmichael*, 890 S.E.2d 209, 224 n.7 (Ga. 2023).
The parties' relative knowledge of the risk of the shooting is a material fact dispute,
and criminal activity and gang affiliation may be probative of Mr. Long's notice,
including whether he was aware of potential threats to his life stemming from
gang activity. Moreover, the trespassing arrests are relevant to Mr. Long's status
as a trespasser or invitee, which is directly relevant to the duty of care Wingate
owed him. Third, he argues that the probative value of the evidence as to his notice
and status is substantially outweighed by unfair prejudice or other confusion or
delay under Federal Rule of Evidence 403. But on summary judgment, Mr. Long
must show "the material cited to support or dispute a fact *cannot* be presented in
a form that would be admissible in evidence," and the Court thinks it premature
at this stage to determine what aspects of Mr. Long's arrest record and criminal
history would be no more prejudicial or cumulative than necessary to establish
notice of criminal activity and status as a trespasser. Fed. R. Civ. P. 56(c)(2)
(emphasis added). Similarly, Mr. Long contends that the evidence is improper
character evidence (seemingly referencing Federal Rule of Evidence 404), but that
rule does not exclude using evidence of crimes or other bad acts for purposes other
than propensity, such as showing Mr. Long's awareness of the criminal activity
around Bedford Pines or notice that he was not permitted to trespass there. Again,
the Court is only considering whether Mr. Long has met his burden under Federal
Rule of Civil Procedure 56(c)(2) of showing the evidence could not possibly be
admissible. The Court expects these issues to be the subject of pretrial motion
practice and will address admissibility more fully closer to trial. Lastly, Mr. Long
argues that the police reports are hearsay, but the Court "may consider a hearsay
statement in passing on a motion for summary judgment if the statement could be
reduced to admissible evidence at trial or reduced to admissible form." *Macuba v.
Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).

[14] To the extent that Mr. Long has incorporated or restated objections to earlier
statements in responses to later statements, the Court incorporates its ruling in
note 13, above, and will not restate the rulings going forward.

adjacent to the 600 block of Parkway. (*Id.* ¶ 42). Mr. Long testified that he was a member of a gang from approximately ages 18 to 22 and pled guilty to violating the Georgia Street Gang Terrorism and Prevention Act for conduct that occurred in 2020. (*Id.* ¶¶ 43, 44).

Justin R. Jackson a former APD police officer and off-duty police officer who patrolled Bedford Pines, testified that Mr. Long was present for multiple shootings in the area around Bedford Pines prior to June 30, 2020. (Long Doc. 97-1 ¶¶ 1, 19). Mr. Long's close friend was shot and killed at a gas station near Bedford Pines in 2019. (Long Doc. 104 ¶ 45). Mr. Long was injured in a drive-by shooting at a laundromat on the block adjacent and perpendicular to the 600 block of Parkway in December 2017. (*Id.* ¶ 47).

## C.    Demario Newton

On June 29, 2020, Demario Newton went to Bedford Pines to visit his girlfriend, Tyisha Thomas, who lived at 461 Felton Drive. (Dep. of D. Newton at 38:2-12, 49:6-18, Newton Doc. 98-1; Newton Doc. 110 ¶ 57).[15] Mr. Newton left his

---

[15] Wingate objects, puzzlingly, on the grounds that while 461 Felton Drive is in fact part of Bedford Pines, it should not be considered part of the "Premises," because it is "half a mile away from the Premises and separated by several city streets and non-Bedford Pines buildings," and also that "a tenant who lived half a mile away from the Premises could override Newton's clear criminal trespass." (Newton Doc. 110 ¶ 57). Whether or not that is true, the Court cannot understand how this objection is responsive to the proffered statement.

girlfriend's apartment with the intention of purchasing food from Zaxby's. (Newton Doc. 110 ¶ 58).[16] After discovering that Zaxby's had closed, Mr. Newton went over to Ms. Lewis's food delivery service operated in the parking lot at 645 Parkway and he purchased food. (*Id.* ¶ 59).[17] Mr. Newton chatted with another customer and other guests while eating at 639 Parkway. (*Id* ¶ 60).[18] There, he was shot, and later went to the hospital for his injuries. (*Id.* ¶¶ 73, 75).

Mr. Newton lived as a guest in a Bedford Pines apartment for a few months about ten years before the subject shooting occurred. (Newton Doc. 103 ¶ 37). From 2011 to 2016, Mr. Newton visited the 600 block of Parkway every other day. (*Id.* ¶ 38). Ms. Lewis testified that she saw him on Parkway "every night" in May and June 2020. (*Id.* ¶ 39). Mr. Newton was arrested in the area around Bedford Pines five times from June 2008 to January 2016. (*Id.* ¶ 41).[19] Mr. Newton was charged with criminal trespass on the Premises in January of 2016, when he threw a gun

---

[16] Wingate's materiality objections to this and the next statement are noted but the facts are recounted for background purposes.

[17] The Court again notes that the parties dispute whether Ms. Lewis had the right to be there.

[18] Wingate's materiality objection on the basis that Mr. Newton was subject to a trespass order is a legal argument, not a fact dispute.

[19] Mr. Newton's objection to this statement is overruled for the reasons the Court gave in note 13, above.

on the roof of 633 Parkway. (*Id.* ¶¶ 43, 44).[20] During one APD encounter with him, Mr. Newton was armed with a gun when he was dealing drugs in the area around Bedford Pines. (*Id.* ¶ 45).

### D.    Ricky Phillips

On June 29, 2020, Ricky Phillips went to Bedford Pines to visit his girlfriend, Jazzmine Mangham, who lived in the Bedford Pines apartment building at 647 Parkway. (Phillips Doc. 110 ¶ 57).[21] Mr. Phillips planned to spend the night in his girlfriend's apartment. (*Id.* ¶ 61). He left his girlfriend's apartment around 10:30 or 11:30 p.m.; the parties dispute whether he was intending to walk to a convenience store or Ms. Lewis's business and Mr. Phillips admits his recollection is "not perfect." (Phillips Doc. 103 ¶ 11). As he was leaving the apartment, Demario Newton stopped Mr. Phillips while still on the Premises, and they started talking. (*Id.* ¶ 12). Mr. Newton was eating in the grassy common area at 639 Parkway. (Phillips Doc. 110 ¶ 59). Others joined Mr. Phillips and Mr. Newton in the common area at 639 Parkway as they ate. (*Id.* ¶ 60). There, Mr. Phillips was shot and went

---

[20] Mr. Newton argues that whether he previously criminally trespassed is irrelevant while simultaneously noting that "the question of Mr. Newton's status is a question of fact for the jury." The Court agrees this is a question of fact for the jury, but that does not render this statement irrelevant.

[21] Wingate's objection "that this statement is immaterial because Ms. Mangham had no rights of occupancy with respect to the grassy common area" is overruled as nonresponsive.

to the hospital for his injuries. (*Id.* ¶¶ 74, 76). He "lost memory" and lost "consciousness" due to the shooting, and his recollection is that the doctor told him he "woke up like a week" after the shooting. (*Id.* ¶¶ 77–78).[22]

### E.    Marcus Sims

On June 29, 2020, Marcus Sims left his parents' house with plans to play basketball and meet friends at Bedford Pines and then return home later. (Sims Doc. 135 ¶ 57).[23] Tamanika Woods, a Bedford Pines resident, invited Mr. Sims to visit. (*Id.* ¶ 58). As noted above, Ms. Woods also invited Mr. Long and the two met there. (*Id.* ¶ 11). After arriving, Mr. Sims joined people in the 639 Parkway common area next to the building where Ms. Woods lived. (*Id.* ¶ 59). Some of those gathered there had purchased food from Ms. Lewis. (*Id.* ¶ 60).

Around 1:08 a.m. on June 30, 2020, unknown assailants fired guns from two vehicles on Parkway Drive towards the common area at 639 Parkway Drive, and Mr. Sims was shot. (*Id* ¶¶ 72–73). Mr. Sims died at Grady Hospital as a result of the injuries he sustained in the shooting. (Sims Doc. 128 ¶ 7).

---

[22] Wingate's materiality objections to these statements are overruled; these statements obviously go to damages.

[23] Again, Wingate's materiality objections as to whether the individuals in question were invitees or could confer invitee status are premature, better addressed in the argument section, and non-responsive as to the actions of the individuals.

**Legal Standard**

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex*, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden

of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. *Fitzpatrick*, 2 F.3d at 1115 (citations omitted).

## Discussion

This is a premises liability case. "It is well settled that a proprietor owes its invitees a duty 'to exercise ordinary care in keeping the premises and approaches safe.'" *Ga. CVS Pharmacy, LLC v. Carmichael*, 890 S.E.2d 209, 218 (Ga. 2023) (quoting O.C.G.A. § 51-3-1). "It is also generally accepted that, while a proprietor is 'bound to exercise ordinary care to protect the invitee from unreasonable risks' of which he has knowledge, he is not an insurer of an invitee's safety." *Id.* at 218–19 (quoting *Lau's Corp. v. Haskins*, 405 S.E.2d 474, 476 (Ga. 1991)). Thus, under the law applicable to this case[24] "where an invitee is injured by a third party's intervening

---

[24] The standard of proof for premises liability cases stemming from third-party criminal acts was substantially overhauled by the Georgia General Assembly in 2025. 2025 Ga. Laws Act 9 (S.B. 68) (the "Act"). Section 9 of that Act, however,

16

criminal act, the proprietor is generally insulated from liability; an exception to this general rule arises, however, where the proprietor had sufficient reason to anticipate such criminal conduct," i.e., reasonable foreseeability. *Id.* (citing *Martin v. Six Flags Over Ga. (II), L.P.*, 801 S.E.2d 24, 30 (Ga. 2017)).

Wingate's Motions center on three issues. First, did Wingate owe any of the Plaintiffs a duty of care to protect them from reasonably foreseeable third-party criminal activity? Stated another way, were the Plaintiffs respectively "invitees," entitled to protection from reasonably foreseeable risks or were they "licensees" or "trespassers" subject to a lower standard of care? Second, assuming Wingate did owe any of the Plaintiffs a duty of care as invitees, was the shooting in this case reasonably foreseeable? Third, even if foreseeable, was there anything Wingate could have done to prevent the harm, that is, was Wingate's breach of duty the proximate cause of Plaintiffs' injuries? Aside from these issues, Wingate also briefly argues Plaintiffs' claims for attorney's fees and punitive damages lack evidentiary support. The remainder of this Opinion takes up these issues one by one, but in short, all of the issues present fact disputes for trial.

---

provided that the changes to such causes of action "shall apply only with respect to causes of action arising on or after the effective date of this Act, and any prior causes of action shall be governed by prior law." *Id.* Accordingly, case law predating the Act applies here.

## I.    Duty of Care

Wingate first argues it did not owe Plaintiffs a duty of care to protect them from the shooting as a matter of law. As the Court explains below, the Court cannot say as a matter of law that Wingate did not owe Plaintiffs such a duty of care.

### A.    Invitees, Licensees, and Trespassers

Georgia law determines the responsibility an owner or occupier of land owes to persons visiting on the land by sorting the visitors into three categories. First, "invitees" are induced or led, by express or implied invitation, to come upon the premises for any lawful purpose. O.C.G.A. § 51-3-1. Second, "licensees" (i) are permitted, expressly or impliedly, to go on the premises for the visitor's own interests, convenience, or gratification; (ii) are not customers, servants, or trespassers; and (iii) do not have any contractual relationship with the owner of the premises. O.C.G.A. § 51-3-2. And lastly, a "trespasser" is "one who, though peacefully or by mistake, wrongfully enters upon property owned or occupied by another." *Jones v. Barrow*, 696 S.E.2d 363, 365 (Ga. Ct. App. 2010). As explained above, only an invitee is owed a duty of ordinary care to be protected from reasonably foreseeable risks such as third-party criminal activity. *Carmichael*, 890 S.E.2d at 218–19.

Courts have distilled the distinction between invitee and licensee as follows: "The general test as to whether a person is an invitee or a licensee is whether the injured person at the time of the injury had present business relations with the owner of the premises which would render his presence of mutual aid to both[.]" *Robinson v. Turner*, 297 S.E.2d 522, 524 (Ga. Ct. App. 1982) (quoting *Higginbotham v. Winborn*, 218 S.E.2d 917, 920 (Ga. Ct. App. 1975)). A mere social guest is not an invitee. *Id.*; *see also Stanton v. Griffin*, 863 S.E.2d 548, 552 (Ga. Ct. App. 2021) ("Georgia has consistently adopted the rule that a social guest is not an invitee but is a licensee.") (internal quotations and citations omitted).

That said, the Georgia Supreme Court has emphasized that "in assessing the landlord's liability to a visitor on *landlord-occupied premises*, the touchstone is *not* the visitor's relationship to the tenant, but his relationship to the *landlord* (i.e., the "owner or occupier of land")." *Cham v. ECI Mgmt. Corp.*, 856 S.E.2d 267, 276 (Ga. 2021) ("In the same vein, characterizing [visitor] Callens as a 'social guest' of [tenant] Jones also would not automatically make Callens a licensee of *Defendants* [landlords], as the Court of Appeals below suggested.") (citing O.C.G.A. § 51-3-1). "And the proper inquiry for evaluating that relationship is assessing 'whether or not the *owner or occupant of the premises* will receive some benefit, real or supposed, or has some interest in the purpose of the visit.'" *Id.* (quoting *Anderson v. Cooper*, 104 S.E.2d 90 (Ga. 1958)). "A person who comes to a tenant's apartment for a social

visit will in most cases be an invitee of the landlord in the common area of an apartment complex, because the landlord generally 'receive[s] some benefit' or has 'some interest' in the guest's presence on the property." *Id.* at 276 n.13 (citing *Anderson*, 104 S.E.2d at 90). "After all, a landlord of an apartment complex is in the business of providing residences to tenants, and a common and natural use of a residence is to invite social guests; it is thus normally in the landlord's interest to lease residences that can be used to entertain social guests, rather than to limit their use by prohibiting or discouraging guests." *Id.* (citing out of state cases).

## B.    Application to this Case

Under this line of argument, the Court cannot categorically say that none of the Plaintiffs were invitees as a matter of law. Viewing the facts in the light most favorable to Plaintiffs, all of the Plaintiffs came to Bedford Pines initially to visit tenants. (Davis Doc. 112 ¶ 57; Long Doc. 111 ¶ 57; Sims Doc. 135 ¶ 57, 58; Newton Doc. 110 ¶ 57; Phillips Doc. 110 ¶ 57).[25] And while Wingate strenuously denies it

---

[25] Wingate essentially argues that Bedford Pines is scattered and that any invitation to a Bedford Pines resident or their guest did not extend to unconnected portions of Bedford Pines. (Davis Docs. 95-1 at 11, 111 at 2). While this is a permissible inference a jury could draw, it is not the only reasonable inference. A reasonable jury could also infer that Wingate sought to draw a connection between the various properties in the public's mind by branding them all as phases of Bedford Pines, such that an invitee to one property would reasonably assume invitation would extend to other Bedford Pines properties. Moreover, Wingate suggests that tenants and their visitors loitering in grassy areas violated the lease and house rules (Davis Doc. 111 at 3), but those factual statements are not properly before the Court. LR 56.1(B)(1)(d) ("The Court will not consider any fact . . . set out

authorized Ms. Lewis to run her business on the Premises, a jury could find that it impliedly invited her and her patrons to dine on the premises by permitting it to occur openly night after night. (Davis Doc. 112 ¶ 59, 60, 64, 65). *See Atkins v. Tri-Cities Steel, Inc.*, 304 S.E.2d 409, 411 (Ga. Ct. App. 1983) ("There must be a mutuality of interest in the subject to which the plaintiff's business related, even if the subject of the business is not for the benefit of the defendant.") (citing *Am. Legion v. Simonton,* 94 S.E.2d 66, 68 (Ga. Ct. App. 1956)); *see also id.* ("[A]n 'invitation is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using it.'") (quoting *Higginbotham,* 218 S.E.2d at 920). Whether a license is implied is generally a jury question. *Smith v. Jewell Cotton Mill Co.*, 116 S.E. 17 (Ga. Ct. App. 1923).

Moreover, while an invitee becomes a licensee by exceeding the scope of the invitation and "go[ing] beyond that part of the premises to which, as it reasonably appears to him the invitation extends . . . . [t]he extent of the invitation would also be a jury question." *Atkins*, 304 S.E.2d at 411. Though the Georgia Court of Appeals found no fact issue as to the temporal scope of an invitation when an injury occurred after a patron left a business that closed and waited around for "some

---

only in the brief and not in the movant's statement of undisputed facts."). In any case, the Georgia Supreme Court has overruled cases finding a lease violation renders a visitor a trespasser as a matter of law, and this evidence would thus only create a fact dispute when considered against Plaintiffs' proffered pattern of nonenforcement. *Cham*, 856 S.E.2d at 278 n.15.

time," this line of logic does not map neatly onto a housing complex where tenants come and go at all hours. *Armstrong v. Sundance Ent. Inc.*, 347 S.E.2d 292, 293 (Ga. Ct. App. 1986). Of course, a landlord can designate and enforce hours of use for common areas; whether Wingate effectively did so here is not so clear that summary judgment can be granted.

Lastly, Wingate argues that Plaintiffs Long and Newton had been arrested for trespassing at Bedford Pines in the past and therefore could not have been invitees as a matter of law. (Long Doc. 104 ¶ 39; Newton Doc. 103 ¶ 43). A previous arrest for trespassing is certainly probative of several aspects of the invitee/trespasser analysis, including that it tends to negate an implied invitation argument if the exact conduct led to arrest in the past, and undermines a claim that an invitation "reasonably appears" to extend to parts of the premises from which the visitor was previously removed. *See Atkins*, 304 S.E.2d at 411.[26] But the Court must contrast this with these Plaintiffs' evidence that they were invited to the Premises for a lawful purpose by a tenant, and the Georgia Supreme Court has made clear that a lease provision prohibiting tenants from allowing unauthorized

---

[26] It may also be relevant to the "lawful purpose" requirement of the invitation, O.C.G.A. § 51-3-1, but of course the fact that either Plaintiff has trespassed in the past is not admissible solely to prove either Plaintiff's character in order to show that on June 29, 2020, they acted in accordance with the character. Fed. R. Evid. 404(b)(1). Whether the specific instances of trespass are relevant for other purposes under Federal Rule of Evidence 404(b)(2) is a question to be answered closer to trial.

visitors access to the premises does not automatically render such an unauthorized visitor a trespasser in all cases as a matter of law. *Cham*, 856 S.E.2d at 278 & n.15 (2021). Accordingly, there is a fact issue on the invitee status for all Plaintiffs.

### C.    Duty of Care to Licensees

Lastly, Plaintiffs argue that even to the extent they were licensees (or trespassers) and subject to a much lower standard of care, a jury question exists on whether Wingate breached that lower standard of care. "The owner of the premises is liable to a licensee only for willful or wanton injury," O.C.G.A. § 51-3-2(b), and "[a] lawful possessor of land owes no duty of care to a trespasser except to refrain from causing a willful or wanton injury." O.C.G.A. § 51-3-3(b). "Generally, '[w]ilful misconduct' is 'an actual intention to do harm or inflict injury,' and wanton misconduct is 'that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent.'" *Harbin v. Ritch*, 876 S.E.2d 737, 739 (Ga. Ct. App. 2022) (quoting *Brown v. Dickerson*, 828 S.E.2d 376, 379 (Ga. Ct. App. 2019)). "A property owner, however, also acts wilfully and wantonly by failing to 'exercise ordinary care to prevent injuring a person who is actually known to be or may reasonably be expected to be, within range of a dangerous act being done or a hidden peril on [the] premises.'" *Id.* (quoting *Brown*, 828 S.E.2d at 379). Stated another way:

> A possessor of land is subject to liability for physical
> harm caused to licensees by a condition on the land if,

> but only if, (a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and (b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and (c) the licensees do not know or have reason to know of the condition and the risk involved.

*Patterson v. Thomas*, 163 S.E.2d 331, 332 (1968) (quoting Restatement (2d) of Torts § 342). Under this standard, "where a licensee has *equal knowledge* of the dangerous condition or the risks involved, there is no wilful or wanton action on the part of the owner and there is no liability to the licensee." *Evans v. Parker*, 323 S.E.2d 276, 277 (Ga. Ct. App. 1984) (citing *Wren v. Harrison,* 303 S.E.2d 67, 69–70 (Ga. Ct. App. 1983); *Joyner v. Sandefur Mgt. Co.,* 310 S.E.2d 578, 580 (Ga. Ct. App. 1983)).

Applying this standard, the Georgia Court of Appeals has held that even where a plaintiff's "legal status was that of a licensee," a court "correctly denie[s] summary judgment" where the landowner "reasonably should have anticipated [the plaintiff's] presence on the property" and "there was evidence that [the defendant] knew that armed robberies had occurred on the property, even though no one had been murdered on the premises." *Bethany Grp., LLC v. Grobman*, 298, 300–01, 727 S.E.2d 147, 149–50 (Ga. Ct. App. 2012). This case is sufficiently analogous to *Bethany Group*—assuming the attack was foreseeable, as discussed further below. A jury could reasonably conclude that Wingate was sufficiently

24

aware of the presence of licensees on its property and the problem of crime on the

Premises, but rather than take action to prevent the crime or presence of licensees

or at the very least warn them of danger, threw up its hands and wantonly gave

up.[27] Summary judgment is thus inappropriate for this additional reason.[28]

## II.    Foreseeability

Wingate next argues that even if it owed a duty of care to protect Plaintiffs

from foreseeable third-party criminal acts, drive-by shootings are per se not

foreseeable. (*See* Davis Doc. 95-1 at 12, 14). As the Court explains below, the law is

otherwise and summary judgment must be denied.

### A.    The Touchstone for Foreseeability – *Carmichael's* Totality of the Circumstances Test

Any discussion on foreseeability of third-party criminal conduct under

Georgia law must begin with the Georgia Supreme Court's 2023 decision in

*Carmichael*. 890 S.E.2d at 218. That case involved two plaintiffs, one who "was shot

during an armed robbery that took place in and around his vehicle in the parking

---

[27] The Court discusses the possibility that any licensees on the property had equal knowledge in its foreseeability analysis below.

[28] The Court agrees with Wingate that Plaintiffs' active negligence argument is not embraced by the pleadings, which only reference premises liability under O.C.G.A. § 51-3-1 and do not identify an act or omission of any specific employee that would be imputed to Wingate under *respondeat superior*. (*See, e.g.,* Davis Doc. 1-1 ¶¶ 19–24).

lot of a CVS store," and one who "was killed during an armed robbery in the parking lot of the Pappadeaux restaurant." *Id.*

The Georgia Supreme Court began its discussion of the cases by recognizing that "the foreseeability of the criminal act informs whether the proprietor's duty of ordinary care owed pursuant to OCGA § 51-3-1 encompasses the duty to keep invitees safe from third-party criminal conduct." *Id.* at 219. "In other words," the court explained, "a proprietor necessarily owes a duty to invitees to exercise ordinary care to keep his premises reasonably safe, see OCGA § 51-3-1; whether that duty of ordinary care embraces the specific duty to protect invitees against third-party criminal conduct hinges on foreseeability. *Id.* at 220.

As the court explained, the reasonable foreseeability of a third-party criminal act is determined from the totality of the circumstances. *Id.* at 222. "The facts establishing foreseeability in a particular case may vary, but evidence of substantially similar prior criminal activity is typically central to the inquiry." *Id.* "Whether knowledge of such past crimes in fact gave the proprietor reason to anticipate the criminal act in question – i.e., whether the act was reasonably foreseeable – depends on the "'location, nature and extent of the prior criminal activities and their likeness, proximity or other relationship to the crime in question.'" *Id.* (quoting *Sturbridge Partners, Ltd. v. Walker*, 482 S.E.2d 339, 341 (Ga. 1997)). "This makes good sense," the court wrote, because

26

> if the past crimes in question (1) happened closer in proximity to the subject premises, (2) happened closer in time to the criminal conduct at issue, (3) happened more frequently, and (4) were more similar to the act that is the subject of the litigation, then all else equal, a proprietor will ordinarily have better and stronger reasons to anticipate that the particular criminal act could occur on the premises.

*Id.* (citing *Sturbridge*, 482 S.E.2d at 340–41).

While the existence of a legal duty is usually a question of law, "because the question of whether a legal duty arises in a particular case turns on the presence of certain factual circumstances, the factfinder also has a role to play in determining whether a third party's criminal attack was reasonably foreseeable." *Id.* at 221. "This determination will often turn on factual questions, such as the nature of the crimes, if any, that previously occurred on or near the premises, where and when those crimes happened, what information the proprietor knew about the crimes, and whether that information gave him reason to anticipate the harm that occurred." *Id.* (citing *Sturbridge*, 482 S.E.2d at 341). "For this reason, it is well settled that the question of reasonable foreseeability in this context is generally a question for the jury to decide." *Id.* (citing *Sturbridge*, 482 S.E.2d at 341).[29]

---

[29] The court did allow for, "as with any jury question," the possibility that "the trial court, in 'plain and palpable cases,' may resolve the question of reasonable foreseeability as a matter of law – that is, if the court concludes on summary

### B.    Wingate's Proposed Bright-Line Rule for Drive-By Shootings

*Carmichael's* broad, "totality-of-the-circumstances" inquiry seems to leave little room for bright-line rules. But Wingate advocates for such a rule in the case of drive-by shootings, pointing to *Hillcrest Foods, Inc. v. Kiritsy*, 489 S.E.2d 547 (Ga. Ct. App. 1997), a case that was specifically called out by *Carmichael* as applying the wrong foreseeability standard. 890 S.E.2d 209 at 224–25 ("And though, notably, two of our prior cases might be read to suggest a bright-line rule requiring evidence of a 'substantially similar' prior crime, we now reject any such reading.") (quoting *Hillcrest Foods* as stating "[o]ur Supreme Court has reaffirmed the requirement of substantially similar criminal acts to establish the foreseeability of the proprietor").

Despite the Georgia Supreme Court's disapproval of *Hillcrest Foods* for applying the wrong foreseeability standard, Wingate points to broad statements in that case about the foreseeability of drive-by shootings in general that it contends survived *Carmichael*. (Doc. 95-1 at 13). For example, the Georgia Court of Appeals mused that "[i]t is difficult to imagine what effective action Hillcrest could reasonably have taken which could have prevented a drive-by shooting even had there been a prior such event," later elaborating that

---

judgment that no rational juror could resolve the issue in the non-moving party's favor." *Carmichael*, 890 S.E.2d at 221 (quoting *Lau's Corp.*, 405 S.E.2d at 477).

> Hillcrest did not ensure Kiritsy's safety, and under the facts herein involved, it cannot be responsible for Kiritsy's injuries because the drive-by shooting was not a foreseeable act. It was an act of terrorism that could have occurred anywhere that the intended victim happened to be. Hillcrest had no basis to foresee such event, and there was no effective action which it could reasonably have taken to prevent said act under the circumstances of this case. . . . The shooting was a transitory act that could have been carried out at any time and place that the intended victim happened to be.

489 S.E.2d at 550–51.

But as Plaintiffs point out, this sweeping language is largely dicta. The court, applying the now-rejected "substantially similar crime" standard, found that "there [wa]s nothing in the record to put Hillcrest on notice of the likelihood of a future drive-by shooting," noting that "[n]one of the prior crimes involved a drive-by shooting." *Id.* at 550; *see also id.* at 551 ("*Under the facts of this case*, the plaintiff has failed to establish that the drive-by shooting was foreseeable by the defendant. . . . Hillcrest did not ensure Kiritsy's safety, and *under the facts herein involved*, it cannot be responsible for Kiritsy's injuries because the drive-by shooting was not a foreseeable act.") (emphasis added). Even if the court were to have applied the proper totality of the circumstances test, it is far from clear that a drive-by shooting would have been foreseeable or preventable under the facts of

that case. *See id.* at 549.[30] So it was unnecessary for that court to opine on what action the defendant there "could reasonably have taken which could have prevented a drive-by shooting even had there been a prior such event." *Id.* at 550.[31]

―――――――――――

[30] The prior crimes identified in that case were as follows:

> 1) December 8, 1991, Tamra White was punched in the face; 2) July 21, 1992, an employee of the Waffle House was the victim of an aggravated assault and attempted rape; 3) July 20, 1993, an unidentified person attempted to run over John Batch with an automobile; 4) January 1, 1994, an unidentified male robbed a patron at gunpoint on the premises; 5) February 6, 1994, Keith Hodapp was attacked on Defendant's premises by Trey Ford and struck with fists; 6) March 20, 1994, a fight broke out at the Waffle House wherein the victim was punched in the face resulting in the offender being charged with simple battery, impersonating a law enforcement officer and giving false information.

489 S.E.2d at 549.

[31] Before *Hillcrest Foods* was disapproved by *Carmichael*, Georgia courts did not appear to recognize a categorical bar against finding foreseeability in drive-by shooting cases. *Alexis v. Riverstone Residential SE*, No. 14-A-52296-5, slip op. at 6–7 (Ga. State Ct. DeKalb Cnty. May 11, 2017) (denying summary judgment on foreseeability grounds, noting that "[t]he prior incidents [cited] include[d] gang activity, sexual assaults, loitering by groups of young men, fighting, physical assaults, police raids, and the firing of gunshots," and concluding that, "[g]iven the extensive criminal history at Bradford Gwinnett, the Court does not conclude that there is an absence of evidence of foreseeability."). Plaintiffs should be cautioned, however, that a holding that a reasonable jury *could* find a drive-by shooting foreseeable should not be read to mean that a jury likely would award all or even most the relief Plaintiffs request, as the plaintiff in *Alexis* learned the hard way. Alrin Crisco, *Apartment Owners Cleared of 99% of Fault in Tenant's Shooting, Dodge Bulk of $4M Verdict*, Courtroom View Network, (Feb. 2, 2018), http://blog.cvn.com/apartment-owners-cleared-of-99-of-fault-in-tenants-

### C.    Application to this Case

Applying *Carmichael* to the facts of this case, the Court does not have difficulty concluding that there is sufficient evidence to send the question of foreseeability to a jury. As explained in Background Section I above, Wingate was aware of extensive gun-related crimes including several prior drive-by shootings. (Davis Doc. 112 ¶¶ 20–24, 26). Wingate contends that Plaintiffs had equal or superior knowledge of these incidents. But as the Court explains below, that is not the relevant issue. Moreover, as discussed below in the causation section, while *Hillcrest Foods* discounted the possibility of preventing the shooting because it occurred at a restaurant, here there is a fact dispute about whether the shooting could have been prevented by Wingate hiring security to prevent groups of people from gathering at night. (*Id.* ¶¶ 32, 35, 37, 38).

### D.    The Question of Plaintiffs' Knowledge

Wingate attempts to import Plaintiffs' knowledge of criminality in the area into the foreseeability analysis,[32] but this does not entitle it to summary judgment on the issue. The Georgia Supreme Court clarified in *Carmichael* that "the knowledge relevant to the question of reasonable foreseeability is the proprietor's

---

shooting-dodge-bulk-of-4m-verdict    [https://perma.cc/QDY3-3WAG].    The Parties are thus strongly advised to discuss settlement.

[32] (*See* Davis Doc. 95-1 at 15) ("To the extent that this shooting was foreseeable to Wingate, it was equally foreseeable to Davis . . . .").

knowledge." 890 S.E.2d at 224 n.7.  ("The plaintiff's knowledge is relevant to the ultimate question of liability, but it has nothing to do with the proprietor's knowledge – and thus, the proprietor's duty. Determining the reasonable foreseeability of a crime asks simply whether the proprietor had sufficient reason to anticipate the criminal act.") (citing *Sturbridge*, 482 S.E.2d at 341).

As the *Carmichael* court explained, Plaintiffs' knowledge is relevant to liability, but in a different step of the premises liability analysis. *See id.* "The rules governing the land proprietor's duty to his invitee presuppose that the possessor knows of the condition and 'has no reason to believe that they (his invitees) will discover the condition or realize the risk involved therein.'" *Rogers v. Atlanta Enters.*, 81 S.E.2d 721, 723 (Ga. 1954) (quoting Restatement (Second) of Torts § 343 (1965)). This is essentially a species of assumption of risk recast as part of the duty of care analysis: "The basis of the proprietor's liability is his superior knowledge and if his invitee knows of the condition or hazard there is no duty on the part of the proprietor to warn him and there is no liability for resulting injury because the invitee has as much knowledge as the proprietor does and then by voluntarily acting, in view of his knowledge, assumes the risks and dangers incident to the known condition."[33] This type of argument is much more common in the slip-and-

---

[33] *See* Restatement (Second) of Torts § 343 (1965), cmt. a ("This Section should be read together with § 343A, which deals with the effect of the fact that the condition is known to the invitee, or is obvious to him . . . . That Section limits the liability

fall context than in the third-party criminal conduct context. *Suresh & Durga, Inc. v. Doe*, 894 S.E.2d 602, 608 (Ga. Ct. App. 2023) ("Defendant has pointed to only one premises liability case based on third-party criminal conduct (as opposed to slip-and-fall physical hazards) where the crime victim's 'superior knowledge' of the risk of violence was at issue.").

However, under this line of cases "it is a plaintiff's knowledge of the specific hazard which precipitates [the injury] which is determinative, not merely her knowledge of the generally prevailing hazardous conditions or of the hazardous conditions which she observes and avoids." *Johnson St. Props., LLC v. Clure*, 805 S.E.2d 60, 66 (Ga. 2017) (quoting *Lore v. Suwanee Creek Homeowners Ass'n, Inc.*, 699 S.E.2d 332, 337 (Ga. Ct. App. 2010)). Thus, it is not enough to say that the shooting was "foreseeable" to Plaintiffs to obtain summary judgment. *Id.* at 66–67 ("In other words, Clure was not injured by the chance falling of the suspended tree limb—a possibility of which she was aware; instead, she was injured when the limb swung off the gutter while Wilburn was attempting to remove it. Wilburn had superior

---

here stated. In the interest of brevity, the limitation is not repeated in this Section."); *Id.* § 343A(1) ("A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness."); *see also Monk v. V.I. Water & Power Auth.*, 53 F.3d 1381, 1384–85 (3d Cir. 1995) ("Section 343A's focus on dangers "known or obvious" to invitees, along with pertinent commentary, indicated it was intended as a variation on the doctrine of assumption of risk.").

knowledge of his own plans and actions with respect to removing the limb and the danger posed by such removal . . . .”). Instead, evidence of the plaintiff's general knowledge of a risk creates a jury question. *Pippins v. Breman*, 262 S.E.2d 477, 479 (Ga. Ct. App. 1979) (“Although the deposition of the plaintiff showed that she was aware of the fact that the area on which she fell had just been mopped or waxed a few minutes prior to her fall, it was a question for the jury as to whether such knowledge constituted knowledge of the danger involved in walking on that area of the floor, and whether in walking on the floor with such knowledge, she was so negligent as to be barred of a recovery.”).[34]

---

[34] Wingate points to the Georgia Court of Appeals' decision in *Johnson v. Atlanta Hous. Auth.*, 532 S.E.2d 701, 703–04 (Ga. Ct. App. 2000), which found equal knowledge in a case involving a plaintiff who was shot as he sat on a bench in front of an apartment building where the plaintiff “was aware that it was dangerous to sit on the bench at night and that prior shootings had occurred on the block.” The Court cannot square this reasoning with the Georgia Supreme Court's later holding in *Johnson Street Properties*, outlined above. 805 S.E.2d at 66–67. But even if the cases could be reconciled to stand for the proposition that an awareness of the risk of encountering the type of crime committed constitutes equal knowledge, the Court would find a fact dispute based on the breadth of evidence of Wingate's superior knowledge under the unique circumstances of this case, which makes this case stand out from the hypothetical scenario Wingate posited that “any individual person who does not have the same amount of information as a corporation made up of hundreds of people could always prevail on a premises liability claim arising out of third-party criminal acts.” (Davis Doc. 111 at 17). And there would still be a fact dispute as to whether Plaintiffs exercised reasonable diligence in light of that knowledge, because groups of people gathering around Ms. Lewis's business is a far cry from sitting alone on a bench by oneself at night. *Suresh & Durga*, 894 S.E.2d at 608 (“[T]he issue of a plaintiff's exercise of due diligence for his own safety is ordinarily a question for the jury.”) (quoting *Rice*, 572 S.E.2d at 327).

Wingate points to no evidence that any of the Plaintiffs were aware of the possibility of the shooting that night, or that they or any of the people around them were likely to be targeted. The shooters have never been identified. (Davis Doc. 105 ¶ 7). None of the victims have been charged with a crime for the events of June 30th. (Davis Doc. 112 ¶ 74). Accordingly, the Court cannot rule as a matter of law that any Plaintiff had superior knowledge of the risk. Therefore, a jury question remains on the issue.

## III.    Causation

Lastly with respect to the premises liability claim, Wingate argues that Plaintiffs "cannot demonstrate any security measure would have prevented a moving car on a public road from firing weapons toward the Premises." (Davis Doc. 95-1 at 18). Wingate thus argues that Plaintiffs cannot show any alleged breach of Wingate's duty of care was the cause of their injuries.

Like with any negligence claim, a plaintiff bringing a premises liability claim must establish causation. *Suresh & Durga*, 894 S.E.2d 602, 605 (Ga. Ct. App. 2023) (citing *Retail Prop. Trust v. McPhaul*, 857 S.E.2d 521, 525 (2021)). "As to the element of causation, '[a] plaintiff must prove that the defendant's negligence was both the cause in fact and the proximate cause of the injury.'" *Retail Prop.*, 857 S.E.2d at 528 (quoting *City of Richmond Hill v. Maia*, 800 S.E.2d 573, 576 (Ga. 2017)). The Parties' arguments do not clearly distinguish between cause in fact and proximate cause.

35

For proximate cause, the question is, "assuming the proprietor had and breached a duty to protect against certain criminal conduct, [was] the kind of harm that occurred a foreseeable result," or stated another way, "a 'probable or natural consequence[ ] of, that breach?'" *Carmichael*, 890 S.E.2d 209, 227–28 (2023) (quoting *Goldstein, Garber & Salama, LLC v. J.B.*, 797 S.E.2d 87, 90 (Ga. 2017)) (alterations in original). While the foreseeability inquiry for proximate cause is not identical to the one for duty of care, the Court finds that under the circumstances of this case, a jury question exists as to whether the drive-by shooting at issue was a foreseeable result of allegedly inadequate security. *See id.* at 227 ("Here, there can be little question that a jury would be authorized to find that the harm to Carmichael – being shot by a robber in the parking lot – is the kind of harm that is a probable and natural consequence of the failure to take adequate security measures to protect the property, including the parking lot, from armed robberies."); *see also Johnson St. Props.*, 805 S.E.2d at 68 (Ga. 2017) (quoting *Ontario Sewing Mach. Co. v. Smith*, 572 S.E.2d 533, 536 (Ga. 2002)) ("[I]t is axiomatic that questions regarding proximate cause are 'undeniably a jury question' and may only be determined by the courts 'in plain and undisputed cases.'").

Wingate's argument is more properly understood as going to cause in fact:[35]
"even if the plaintiff can establish that her injuries from a third-party criminal actor
were foreseeable based on conditions known to the defendant, the plaintiff still
must show that breaches by the defendant led to her injuries. *Suresh & Durga*, 894
at 609  (citing *Johns v. Housing Auth. for City of Douglas*, 678 S.E.2d 571, 573–74 (Ga.
Ct. App. 2009)). "If 'a jury would have to speculate' that the ordinary care
measures the plaintiff is alleging were required would have prevented the third-
party criminal actor from completing the crime, then '[t]he causal connection
between the [defendant's] conduct and [the plaintiff's] injury is simply too remote
for the law to permit a recovery." *Id.* (quoting *Johns*, 678 S.E.2d at 573–74); *see also*
*Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quoting *Hedberg v.*
*Ind. Bell Tel. Co.*, 47 F.3d 928, 931–32 (7th Cir. 1995)) ("Speculation does not create
a genuine issue of fact; instead, it creates a false issue, the demolition of which is a
primary goal of summary judgment.").

Wingate argues that because the shooting occurred from a public road that
cannot be gated or blocked off, it could not have taken any steps to prevent the

---

[35] In actuality, Wingate's arguments about the feasibility of hiring additional
security are better analyzed under the breach prong, where "the factfinder must
weigh the likelihood and severity of the foreseeable harm against the cost and
feasibility of additional security measures in considering whether the duty owed
was breached." *Carmichael*, 890 S.E.2d at 220. Questions of breach are virtually
always jury questions. *See id.* (citing *Jackson v. Post Props., Inc.*, 513 S.E.2d 259, 263
(1999)).

shooting. (Davis Doc. 95-1 at 21). Plaintiffs argue in response that Wingate's witnesses conceded that in the past, enhanced security patrols on the 600 Parkway Drive block of Bedford Pines "yielded results" by reducing crime. (Davis Doc. 112 ¶ 85). Moreover, Plaintiffs' experts have opined that the shooting was more likely than not preventable with security personnel: (1) patrolling Wingate's primary problem area (because security patrols deter crime), (2) enforcing house rules (to disperse the outdoor restaurant and crowd from the 639 Parkway common area so that they were not exposed targets in an area Wingate knew had a pattern of violent crime), and/or (3) warning those gathered of the pattern of violent crime and the lack of needed nighttime security. (*Id.* ¶ 80).[36] The Georgia Court of Appeals has found that a similar combination of evidence is sufficient to create a fact dispute in a negligent security case. *Pappas Rest., Inc. v. Welch*, 901 S.E.2d 751, 758 (Ga. Ct. App. 2024) (expert testimony that the crime was preventable plus testimony from defendant and security company employees that security had reduced crime on the property was sufficient to create fact dispute on causation). The Court concludes the same result should occur here—summary judgment must be denied.

---

[36] Wingate has not moved to exclude the experts' testimony in connection with its summary judgment motions, and the deadline to do so has not expired. LR 26.2(C), NDGa.

### IV.    Punitive Damages and Attorney's Fees

Finally, Wingate seeks summary judgment on Plaintiffs' claims for punitive damages.

Punitive damages may be recovered when 'it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.'" *Smith v. Tommy Roberts Trucking Co.*, 435 S.E.2d 54, 56 (Ga. Ct. App. 1993) (quoting O.C.G.A. § 51-12-5.1(b)). "Ordinarily, the imposition of punitive damages is a question for the jury." *Baumann v. Snider*, 532 S.E.2d 468, 474 (Ga. Ct. App. 2000) (citation omitted). "The peculiar facts and circumstances of a particular case, when supported by clear and convincing evidence of culpability, may cause ordinary negligence to give rise to the presumption that the conduct showed a conscious indifference to the consequences and an entire want of care." *Langlois v. Wolford*, 539 S.E.2d 565, 567 (Ga. Ct. App. 2000).

Similarly, attorney's fees are recoverable under Georgia law in a negligence action where the "defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." *Kin Chun Chung v. JPMorgan Chase Bank, N.A.*, 975 F. Supp. 2d 1333, 1351 (N.D. Ga. 2013) (citing O.C.G.A. § 13–6–11). "[Q]uestions concerning bad faith, stubborn litigiousness,

and unnecessary trouble and expense, under O.C.G.A. § 13-6-11, are generally questions for the jury to decide." *Am. Med. Transp. Grp., Inc. v. Glo-An, Inc.*, 509 S.E.2d 738, 741 (Ga. Ct. App. 1998) (quoting *Backus Cadillac-Pontiac, Inc. v. Ernest*, 394 S.E.2d 367, 370 (Ga. Ct. App. 1990)) (alterations in original). Bad faith, under O.C.G.A. § 13-6-11, "is bad faith arising out of the transaction upon which the complaint is based and refers to a time prior to the institution of action." *Brannon Enters., Inc. v. Deaton*, 285 S.E.2d 58, 60 (Ga. Ct. App. 1981) (citation omitted). The allegation of bad faith "must relate to the acts in the transaction itself prior to the litigation, not to the conduct during or motive with which a party proceeds in the litigation." *Fresh Floors, Inc. v. Forrest Cambridge Apartments, L.L.C.*, 570 S.E.2d 590, 592 (Ga. Ct. App. 2002) (citation omitted).

The same evidence can authorize punitive damages and attorney's fees for bad faith. *Ford Motor Co. v. Stubblefield*, 319 S.E.2d 470, 482 (Ga. Ct. App. 1984) (finding actual knowledge of a dangerous condition and decision not to correct the condition could constitute both conscious disregard and bad faith). As the Court explained above, much of the factual disputes in this case concern whether Wingate had notice of the security risk and if so whether it failed to act or was unable to act. Because these fact disputes also pervade Plaintiffs' claims for attorney's fees and punitive damages, summary judgment is inappropriate on these claims as well.

40

**Conclusion**

For the above reasons, it is

**ORDERED** in Case No. 1:22-cv-01692-VMC, *Roland v. Wingate Management Company, LLC*, the Motion for Summary Judgment (Doc. 95) is **DENIED**. It is

**FURTHER ORDERED** in Case No. 1:22-cv-01693-VMC, *Long v. Wingate Management Company, LLC*, the Motion for Summary Judgment (Doc. 97) is **DENIED**. It is

**FURTHER ORDERED** in Case No. 1:22-cv-01694-VMC, *Newton v. Wingate Management Company, LLC*, the Motion for Summary Judgment (Doc. 96) is **DENIED**. It is

**FURTHER ORDERED** in Case No. 1:22-cv-01695-VMC, *Phillips v. Wingate Management Company, LLC*, the Motion for Summary Judgment (Doc. 96) is **DENIED**. It is

**FURTHER ORDERED** in Case No. 1:22-cv-01696-VMC, *Sims v. Wingate Management Company, LLC*, the Motion for Summary Judgment (Doc. 121) is **DENIED**. It is

**FURTHER ORDERED** that the Parties are **DIRECTED** to confer on a schedule for mediation and trial(s) of these civil actions (including deadlines to submit respective proposed consolidated pretrial orders) and to file a report of the conference and proposed schedule by **NO LATER THAN** October 15, 2025.

**SO ORDERED** this 15th day of September, 2025.

Victoria Marie Calvert
United States District Judge